Christina G. Lipe v. Commissioner.
Lipe v. Commissioner
Docket No. 1298.
United States Tax Court
1944 Tax Ct. Memo LEXIS 129; 3 T.C.M. (CCH) 917; T.C.M. (RIA) 44285; August 30, 1944
*129 Frederick C. McLaughlin, Esq., 527 Fifth Ave., New York, N. Y., for the petitioner. Arthur Groman, Esq., for the respondent. KERN Memorandum Findings of Fact Opinion The Commissioner determined deficiencies in petitioner's income taxes for the calendar years 1938 and 1939 in the respective amounts of $2,919.10 and $3,803.81, as a result of including in her taxable income that part of the income of two trusts used to pay premiums on insurance on petitioner's life. Petitioner challenges the correctness of respondent's determination on the theory that petitioner was not the grantor of the trusts, within the meaning of section 167 (a) (3) of the Internal Revenue Code. Findings of Fact Petitioner is an individual taxpayer, residing in New York City. She filed her income tax returns for 1938 and 1939 with the collectors for the third and second districts respectively of New York. In 1928 petitioner was a widow with two daughters, Virginia, age 27 years and married, and Rosann, age 21 years and unmarried. Petitioner had inherited from her husband, who died in 1921, about three-fourths of her estate which, in 1929, was estimated by her to be worth about six million dollars. Her husband *130 had left his estate to her with the understanding that she would see that their daughters, then about 14 and 20 years old, received their fair share when they reached an age of discretion. In 1928 petitioner owned 2,100 shares of capital stock of the Bankers Trust Co. As of April 8, 1929, ten shares of stock of a par value of $10 per share were issued for every share of the $100 par value stock then outstanding, so that the 2,100 old shares became 21,000 new shares. During the Christmas holidays of 1928, petitioner announced to her daughters her intention to give them Bankers Trust Co. stock, in fulfillment of their father's wish, since, in her opinion, her youngest daughter having reached the age of 21 years, they had each arrived at an age of discretion. Shortly after January 1, 1929, she instructed the Bankers Trust Co., as custodian of her securities, to transfer the stock to her daughters. The stock was not, in fact, transferred until April 24, 1929, but the delay was not occasioned by any act or request of the petitioner. It was occasioned by the time required by the Bankers Trust Co. to select the shares owned by petitioner which had the lowest cost basis. It was the advice *131 of the Trust Co. that petitioner, for her own best interests income-tax wise, should give to her daughters those shares having a low cost basis. Following their mother's announcement to them of the impending gifts, the daughters discussed what they should do with the income which they would receive. They consulted a long-time friend of the family who was in the insurance business, and he advised them to invest some part of the income in insurance on the life of their mother. They decided to do so, and on February 14, 1929, petitioner, at the request of her daughters, signed an application for life insurance in the total amount of $250,000, for the benefit of her daughters in equal shares, reserving no right to change beneficiaries. This amount was later reduced to $200,000, and on March 16, 1929, two policies for $100,000 each, were issued and delivered to petitioner, who, on April 27, 1929, irrevocably assigned each to the daughter named therein as sole beneficiary. The initial premium on each policy was paid by the daughter to whom it was later assigned, and the petitioner did not lend or otherwise furnish them with the money required for that purpose. Petitioner had been solicited *132 to buy additional insurance, and had refused, because she did not particularly believe in insurance, and did not want any more. She was not enthusiastic about the girls' plan to buy insurance, but, at their request, she acquiesced. Petitioner had owned, since 1924, policies of insurance totaling $75,000. She had considered cancelling this insurance and had consulted with her bank about the matter, and had decided to do so at an appropriate time. During her daughters' negotiations for insurance, their insurance adviser called their attention to the fact that for approximately the same premium which they would have to pay for $50,000 worth of insurance, they could assume and carry the $75,000 owned by their mother. They requested their mother to assign to them her policies, and, upon her indication of her willingness to do so, they reduced the application theretofore filed from $250,000 to $200,000, and petitioner irrevocably assigned to them two policies for $37,500 each, representing the insurance which she had carried since 1924. Some time after the arrangements for the insurance were made, Virginia the older daughter, discussed the proper disposition of her funds with her husband, *133 a broker, and he suggested she consult the Bankers Trust Co. (hereinafter called "the bank") about the advisability of creating a trust. She consulted the bank, and the bank mentioned the matter to her mother, petitioner here, but she referred them to her daughters. A conference was arranged on March 19, 1929, at which petitioner, representatives of the bank and Mr. Bullock, an attorney representing the girls at the bank's request, were present. Mr. Bullock had represented petitioner in some other and earlier matters but, in this instance, petitioner having insisted the girls be represented by counsel, the bank requested Mr. Bullock to represent them, and his fee was paid by the girls. As a result of this conference, and immediately thereafter, Mr. Bullock drafted trust instruments and sent them to the girls for their approval. They accepted them, and executed them early in May without suggestion or change. In each trust instrument, one daughter, as grantor, irrevocably transferred to the Bank, as trustee, the Bankers Trust Co. stock which she had received from her mother, and assigned to the trustee the insurance policies on her mother's life. The trustee was directed to pay from *134 the income of the trust the insurance premiums during the life of the insured, and upon her death, to collect the proceeds of the policies and invest them. After payment of the premiums, the trustee's commission, and a reasonable reserve for the payment of further premiums, as well as the trust expense, the balance of the income was required to be paid to the grantor's sister, during her life, and upon her death, the corpus was to be paid to her issue, if any. If there were no surviving issue of the beneficiary, the income should be paid to the donor, if surviving, and if not, or upon her death, the corpus to donor's issue, if any, and, if none, then two-thirds of the corpus was to go to an aunt of the grantor, one-sixth to a second cousin, and one-sixth to the New York Association for the Blind, with provision for division of the share of any remainderman who may have died between the survivors. The trustee, which was the Bankers Trust Co., was given broad powers of management of the trust estate, but was forbidden to sell or exchange the trust property without written directions of petitioner, or written waiver of that power, during her life. After her death, the trustee was specifically *135 relieved from liability for decrease in the value of the trust property. This provision was not inserted at petitioner's request or for her benefit. It was inserted at the request of the bank, which wished to have lodged elsewhere than with it the discretion concerning the handling of its own stock which was the sole income-producing asset of the trust. The trust has been administered according to its terms since its inception, and the income has been paid as directed. The stock in each trust yielded $18,000 in dividends in 1929. The premiums on the insurance paid from the income of each trust amounted to about $6,000 in each of the years 1938 and 1939. Petitioner made completed, unrestricted, bona fide gifts to her daughters of the Bankers Trust Co. stock which now constitutes the corpus of the trusts of which the daughters were the grantors. Opinion KERN, Judge: The matter before us is almost wholly a question of fact. If petitioner did, in fact, make completed bona fide gifts to her daughters of the property which was later placed in trust, then petitioner can not be held to be the grantor of the trusts, and the income thereof applied to the payment of premiums on *136 insurance on her life is not taxable to her under section 167 (a) (3) of the Internal Revenue Code. Respondent believes the transfers of the stock did not constitute such absolute gifts, but were part of a plan on petitioner's part to avoid the payment of tax to which she would have been subject had she created the trusts in her own name and provided for the payment of insurance premiums from the income, and that petitioner was, in reality, a grantor of each trust. The facts gleaned from the documents in evidence, without recourse to the explanation afforded by the oral testimony, might give rise to reasonable suspicions on the part of the respondent. But the oral evidence, if it is not to be completely disregarded, dispels the major difficulties. That evidence, which seems completely credible, and which is uncontradicted, and supported by surrounding circumstances, is to the effect that petitioner, as early as Christmas, 1928, advised her daughters that she was going to give them this stock for their own, without reservation or restriction, pursuant to their father's wish. She had, several years earlier, inherited about three-fourths of her six million dollars estate from her husband, *137 who left it to her with the expressed hope that when their daughters, then young, reached mature years, she would see that they received their fair share of his fortune. The younger daughter, Rosann, had become twenty-one years old in March of 1928, and at Christmas time of that year petitioner told her daughters that, in her opinion, they had each attained an age of discretion and mature judgment and that she had decided to give them the Bankers Trust Co. stock. This stock constituted about one-third of her entire estate, which would be a little over one-half of the fortune which her husband had left. Petitioner testified that the discharge of this moral obligation was her sole motive in making the gift, that she would have made it regardless of the tax consequence. It seems a reasonable and compelling one. She advised the bank of her determination early in January, and it was her recollection that she then signed the transfer orders upon which the blank spaces were not filled in by writing. The orders are in evidence, but are dated April 24, a delay which she said was caused by the bank's method of handling the transfer, and not to any direction or request by her. Respondent contends *138 she did not sign the transfer orders until the date they bear, by which time, admittedly, the creation of the trusts by the daughters had been decided upon. There are indications that she did not sign the orders in January, as she now remembers, after the passage of nearly fifteen years. But that fact is important only in that it constitutes some evidence from which it might be inferred that she made the gift subject to and conditioned upon the creation of the trusts. But the evidence here is sufficiently clear and convincing that the gift, whenever it was legally consummated, was unqualified and absolute, and prompted by the motive outlined above, to overcome the inference arising from the coincidence of the dates. The restriction placed by the trust instrument on the corporate trustee, as a result of which it could not sell or exchange the trust stock of which it was the issuing corporation, except at the written direction of petitioner, or pursuant to her waiver of that power, was inserted in the instruments at the request of the bank, and not at petitioner's request. The bank wished to be relieved of the primary responsibility of determining whether to hold or to dispose of its *139 own stock. The attorney who drafted the trusts testified that such a provision was in accordance with sound trust practice. This was the only power or right vested by the trust indentures in petitioner, and it was not designed for petitioner's benefit or advantage. Petitioner admittedly knew, by the time the stock was actually transferred, that her daughters were creating the trusts. We think it not unnatural, under the circumstances, that she should continue to take a lively interest in their welfare after, as well as before, she made the gifts. She testified that she did not suggest the use of trusts, and the daughters testified that the idea was suggested by the husband of the older girl, Virginia, by the trust company, and by their attorney, but not by their mother. It is clear that petitioner never owned the greater part of the insurance paid for with the trust income. She had owned, but had already discussed with the bank, her intention to cancel, in due time, $75,000 of it. The $200,000 she had never owned, and was never obligated for the payment of premiums thereon. She signed the application for it only at the request of her daughters and their insurance adviser. She did *140 not pay the first, or any later premium, and did not furnish by loan or otherwise any money with which they were paid. She further testified that she did not particularly believe in life insurance, and did not want any more. At their request, also, she irrevocably assigned to them in equal shares the $75,000 of insurance which she owned, but which she planned to cancel. The daughters then assigned these policies, together with those which they had purchased, totaling $275,000, to the trusts. It is certainly pertinent to consider the fact that the stock which petitioner transferred to her daughters was probably worth about two million dollars, since it was about one-third of petitioner's six million dollar estate. Its annual yield in dividends was about $36,000, of which only about one-third was required or used to pay the insurance premiums. There is no question that petitioner finally and irrevocably disposed of the stock. If her motive was primarily, or even substantially, that of tax avoidance by the creation of trusts for the purpose of paying for insurance upon her own life, she chose a most expensive method to accomplish it. We think it highly unlikely that her gift sprang *141 from any such motive. As we have pointed out, this is essentially a question of fact, and there is no dispute concerning the legal principles involved. For that reason, it is unprofitable to review the cases. It is sufficient to say that, in the cases cited by respondent, and other of similar effect, it has been held, on the facts, that there was either an incomplete gift, or some economic advantage accruing to the donor. See George H. Whiteley, Jr., 42 B.T.A. 402, affirmed 120 Fed (2d) 782, certiorari denied 314 U.S. 657; Commissioner v. Van Dusen, 138 Fed. (2d) 510. See also Commissioner v. Jergens, 127 Fed. (2d) 973. We have found that there were, in the instant case, bona fide completed gifts of the bank stock to the petitioner's daughters, and that they were the grantors of the several trusts. It follows that the respondent's determination was in error. Decision will be entered for the petitioner.